**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— ) | |
| **ARTAVIOUS LOVE**, *et al.*,                   ) | |
|                                                 ) | |
|         **Plaintiffs**,                         ) | |
|                                                 ) | |
|             v.                                  )        **Case No. 24-cv-2571 (APM)** |
|                                                 ) | |
| **BUREAU OF PRISONS**, *et al.*,                ) | |
|                                                 ) | |
|         **Defendants**.                         ) | |
| ———————————————————— ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I.    INTRODUCTION

When a person is ordered into the custody of the Federal Bureau of Prisons ("BOP"), the BOP must decide where to house them. That determination rests in part on the individual's "criminal history score." A criminal history score is a numerical value calculated by the BOP that serves as a proxy for the seriousness of the person's past offenses. Higher criminal history scores generally correlate to placement in more restrictive carceral settings, such as high- and medium-security facilities, whereas lower scores generally correspond to less restrictive housing, such as low- and minimum-security facilities. Lower-security settings ordinarily offer greater freedom of movement, as well as more fulsome programming opportunities.

Over 95 percent of residents enter the BOP convicted of federal crimes in federal courts. For these individuals, their criminal history score is determined by the number of criminal history points calculated under the U.S. Sentencing Guidelines ("Sentencing Guidelines"). Their total criminal history points, as determined by the U.S. Probation Office, is transmitted to the BOP following sentencing and automatically converted into the BOP's criminal history score.

Since 1997, the BOP also has housed persons convicted in D.C. Superior Court of felony D.C. Code offenses ("D.C. Code Offenders"), but it calculates their criminal history scores differently than their federal counterparts'. The BOP's scoring methodology used for D.C. Code Offenders resembles that of the Sentencing Guidelines, but it takes into consideration various convictions that the federal guidelines expressly exclude, including stale offenses, misdemeanors, and juvenile adjudications. The BOP admits to using this "heightened scoring criteria." This disparate approach often results in more criminal history points and higher criminal history scores for D.C. Code Offenders, which means that they face an increased likelihood of placement in more restrictive housing facilities than their federal peers.

Plaintiffs Artavious Love and Diamante Butler are individuals convicted of felony D.C. Code offenses in the custody of the BOP. They filed this suit on behalf of themselves and others similarly situated to challenge the BOP's disparate methodology for calculating criminal history scores for D.C. Code Offenders. They raise claims under the Administrative Procedure Act ("APA") and the Fifth Amendment's Equal Protection Clause. At present, Plaintiffs seek a preliminary injunction that would require the BOP (1) to stop using a separate scoring system for D.C. Code Offenders, (2) to begin scoring D.C. Code Offenders in accordance with the Sentencing Guidelines, and (3) to re-score such individuals currently in custody, including Plaintiffs.

Defendants are (1) the BOP; (2) Collette Peters, in her official capacity as Director of the BOP; and (3) Merrick Garland, in his official capacity as Attorney General of the U.S. Department of Justice. Defendants oppose the request for injunctive relief, arguing that Plaintiffs have failed to carry their burden as to each of the four injunction factors. They also move to dismiss on a variety of grounds. At the threshold, they urge dismissal for lack of standing and Plaintiffs' failure to exhaust administrative remedies. Additionally, they contend that the court is statutorily

foreclosed from reviewing Plaintiffs' housing designations.  Finally, they contend that Plaintiffs have failed to state claims under the APA and the Equal Protection Clause.

For the reasons discussed below, the court denies Plaintiffs' request for a preliminary injunction because they have failed to demonstrate irreparable harm.  Defendants' motion to dismiss will be denied, however, except as to Plaintiff Butler, who failed to exhaust administrative remedies.

## II.    BACKGROUND

### A.    The BOP's System of Calculating Criminal History Scores

In 1997, Congress passed the National Capital Revitalization Self-Government Improvement Act.  Pub. L. No. 105-33, Title XI, 111 Stat. 251, 712 (1997).  As part of that legislation, Congress transferred to the BOP responsibility for felons sentenced under the D.C. Code in D.C. Superior Court.  *See id.*, § 11201, 111 Stat. at 734.  The BOP became "responsible for the custody, care, subsistence, education, treatment and training of such persons." *Id.*, § 11201(b).  As of October 2024, the BOP had over 2,500 D.C. Code Offenders in its custody.[1]

The BOP determines where D.C. Code Offenders will be housed.  18 U.S.C. § 3621. In making that assessment, the BOP is required to consider various statutory factors, including "bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons[.]"  *Id.* § 3621(b).  The BOP also is authorized to consider "the resources of the facility

---

[1] D.C. Corrs. Info. Council, CIC Info Sheet, Individuals Incarcerated in the Bureau of Prisons Under the DC Code as of October 1, 2024, *available at* https://perma.cc/ZJ3C-4CK2 (last visited Jan. 6, 2025).

contemplated," "the nature and circumstances of the offense," and "the history and characteristics of the prisoner." *Id.*

In 2006, the BOP issued Program Statement 5100.08, which outlines how the BOP weighs these statutory factors when assigning individuals to specific facilities. Class Action Compl. for Declaratory & Injunctive Relief, ECF No. 1 [hereinafter Compl.], ¶ 20.[2] BOP facilities fall into one of five security levels: minimum, low, medium, high, and administrative. Program Statement 5100.08 [hereinafter, PS 5100.08] at 7. Using several different inputs, the BOP calculates a "security point score," which it "then matche[s] with a commensurate security level institution" in accordance with the chart below:

| Security Level | Custody Level | Male | Female |
|---|---|---|---|
| MINIMUM | COMMUNITY and OUT | 0-11 points | 0-15 points |
| LOW | OUT and IN | 12-15 points | 16-30 points |
| MEDIUM | OUT and IN | 16-23 points | * |
| HIGH | IN and MAXIMUM | 24+ points | 31+ points |
| ADMINISTRATIVE | All custody levels | All point totals | All point totals |

PS 5100.08 at 8. Among the factors the BOP considers when determining a security point score are: "voluntary surrender," the "severity of current offense," "history of violence," "history of escape or attempts," "type of detainer," "age," "education level," "drug and alcohol abuse," and "criminal history score." Compl. ¶ 24 (citing PS 5100.08 at 30–38).

---

[2] *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5100.08: Inmate Security Designation & Custody Classification ("PS 5100.08") (2006), https://perma.cc/Q4W3-N7ZN (last visited Jan. 14, 2025).

According to Plaintiffs, the "criminal history score is one of the most influential categories in determining the total security point total." Compl. ¶ 26. As an example, "while the 'severity of current offense' category can increase the security point [score] by a maximum of seven points for the 'greatest' severity offense, the criminal history score can increase the security point score by ten points — a difference large enough on its own to move a prisoner from a low-security facility to a high-security facility." *Id.* (citing PS 5100.08 at 8, 32–33).

Plaintiffs say that "Program Statement 5100.08 establishes two systems for deriving criminal history scores." *Id.* ¶ 27. For persons convicted of federal offenses in federal district courts, the BOP converts the defendant's criminal history points calculated under the Sentencing Guidelines—usually found in the judgment, presentence investigation report, or statement of reasons—into a BOP "criminal history score." *Id.* ¶ 26. This conversion is done "automatically." Defs.' Combined Mem. in Opp'n to PI Mot. and in Supp. of Mot. to Dismiss, ECF No. 28-1 [hereinafter Mot. to Dismiss], at 5.

The BOP takes a different approach for D.C. Code Offenders. Unlike their federal peers, D.C. Code Offenders do not enter the BOP with criminal history point totals calculated under the Sentencing Guidelines. One might think that the BOP would take the D.C. Code Offender's presentence investigation report, which outlines the defendant's criminal history in much the same way as a federal report, and calculate criminal history points consistent with the Guidelines' scoring instructions. But that is not what the BOP does. Instead, it obtains an "NCIC III Report," which is a criminal history report maintained by the Federal Bureau of Investigation. Compl. ¶ 33. Program Statement 5100.08 then instructs how many points should be assigned to each prior conviction depending on the length of the prior term of imprisonment. *Id.* ¶ 34. This scoring system resembles the Sentencing Guidelines' instructions on assignment of criminal history points,

but importantly it "omits all of its definitions and exceptions." Pls.' Mot. for Prelim. Inj., ECF No. 2-1 [hereafter PI Mot.,], at 7.[3]

For example, the Sentencing Guidelines excepts certain categories of offenses and sentences, such as stale convictions, petty offenses, juvenile adjudications, suspended sentences, and multiple sentences for offenses in the same charging instrument or that were charged on the same day. Compl. ¶ 37. The BOP's criminal history points calculus for D.C. Code Offenders does not include these exceptions. *Id.* This "materially different" approach to scoring D.C. Code Offenders, Plaintiffs allege, results in "systematically [ ] higher criminal history points, and therefore higher criminal history scores [for D.C. Code Offenders], as compared to similarly situated federal counterparts." *Id.* ¶¶ 32, 70; *see also id.* at ¶¶ 46, 53, 59, 65. The consequence, they claim, is that D.C. Code Offenders are disproportionately placed in higher-security facilities, which subjects them "to increased violence, less rehabilitative programming, . . . lower wages for prison jobs[, and] inflated risk assessment scores that impact their ability to receive post-conviction relief." PI Mot. at 2–3.

Defendants do not appear to dispute that D.C. Code Offenders are subject to a more severe scoring system than their federal counterparts. Indeed, they acknowledge that their approach to D.C. Code Offenders involves "heightened scoring criteria." Mot. to Dismiss at 33. But they defend the differential treatment. They say it is "justified by the Bureau's requirement to consider security concerns in their placement of offenders, and the underlying violence of offense[s]

---

[3] There is a slight wrinkle to the BOP's criminal history scoring policy. The BOP uses the same approach it applies to D.C. Code Offenders to other offenders who do not enter the BOP with a calculated criminal history score under the Sentencing Guidelines. PS 5100.08 at 33. That includes cases in which the federal defendant waived the presentence investigation report, where the offense predated the Sentencing Guidelines (November 1, 1987), and certain state and military offenders. *Id.*; *see also* Defs.' Status Report, ECF No. 36, at 3 (reporting that the BOP presently has approximately 120 inmates convicted before November 1, 1987, in its custody). Whether these individuals are subject to unlawful unequal treatment is not before the court.

committed by D.C. Code Offenders which is a highly relevant distinction between the two populations." *Id.*

### B.    Plaintiffs Love and Butler

Plaintiffs are two D.C. Code Offenders in the custody of the BOP.  Each maintains that he has received or will receive arbitrarily higher criminal history points, resulting in a higher criminal history score.

Plaintiff Artavious Love entered the BOP in early 2020 following his conviction for a D.C. Code offense.  Compl. ¶ 79.  Applying Program Statement 5100.08, the BOP determined that Love had 10 criminal history points, which converted to a criminal history score of eight.  *Id.* ¶ 82. Love contends that, if the BOP had calculated his criminal history points according to the Sentencing Guidelines, he would have had only five criminal history points, which converts to a criminal history score of four.  *Id.* ¶ 91.  He claims that the "arbitrarily higher criminal history score contributed" to his initial placement in a high-security facility and now "contributes to his incarceration in a medium-security facility," where he shares a cell with another inmate.  *Id.* ¶¶ 94– 95; PI Mot., Ex. D, Decl. of Artavious Love, ECF No. 2-5 [hereinafter Love Decl.], ¶¶ 17–18. Had the BOP treated him as it does federal offenders, his reduced criminal history score would have made him eligible for a low-security facility.  Compl. ¶ 95.  A low-security facility, he believes, would afford him more freedom of movement, including the possibility of not sharing a cell; greater programming opportunities; and less risk of violence.  *Id.* ¶¶ 97–104; Love Decl. ¶¶ 17–19.

Plaintiff Diamante Butler entered the BOP in or around May 2024.  Compl. ¶ 105.  As of the filing of the complaint, the BOP had not yet calculated his criminal history score.  *Id.* ¶ 106. He maintained that it was "nearly certain" that he would receive more criminal history points under

Program Statement 5100.08's point system for D.C. Code Offenders than under the Sentencing Guidelines. *Id.* ¶ 115. Although placed in a medium-security facility, Butler says he was told that, once scored, he likely would be sent to a high-security facility, where he would have less freedom of movement and fewer programming opportunities. *Id.* ¶¶ 118–120; PI Mot., Ex. F, Decl. of Diamante Butler, ECF No. 2-7 [hereinafter Butler Decl.], ¶ 3.

In the intervening months, the BOP did score Butler. He was determined to have "two criminal history points, resulting in a criminal history score of two," which is "exactly what Butler contends he should have as his criminal history points and criminal history score if he had been sentenced under the U.S. Sentencing Guidelines." Mot. to Dismiss at 16; Compl. ¶ 114 (alleging that he would receive only two criminal history points and a criminal history of two were he scored under the Sentencing Guidelines' rules). Butler remains in a medium-level facility. Mot. to Dismiss, Decl. of Patrick Kissell, ECF No. 28-2 [hereinafter Kissell Decl.], ¶ 2.

### C.    Procedural History

Plaintiffs filed this action on September 9, 2024, challenging the BOP's method of scoring criminal history points for D.C. Code Offenders. *See generally* Compl. They immediately moved for a preliminary injunction to, among other things, enjoin the BOP from continuing its unequal treatment of D.C. Code Offenders. *See generally* PI Mot. Plaintiffs assert five claims. The first three are substantive claims under the APA, alleging that the challenged scoring practice is (1) arbitrary and capricious, (2) contrary to law, and (3) contrary to their constitutional right to equal protection under the law. Compl. at 26–29. The fourth cause of action asserts a violation of the Equal Protection Clause. *Id.* at 29–31. And their final claim is a procedural violation of the APA for failing to subject Program Statement 5100.08 to notice and comment. *Id.* at 31.

On October 22, 2024, Defendants opposed the request for injunctive relief and moved to dismiss the complaint. At the outset, Defendants argue that Plaintiffs lack standing and failed to exhaust administrative remedies, and that the court is statutorily barred from reviewing Plaintiffs' housing determinations. *See generally* Mot. to Dismiss at 15–26. They also contend that Plaintiffs have not made out any of their claims, under both the preliminary injunction and pleading standards. *Id.* at 27–39. They also argue that the remaining, non-merits injunction factors warrant denial of Plaintiffs' motion. *Id.* at 39–44.

The court heard argument on the motions on December 19, 2024.

## III.    DISCUSSION

### A.    Motion for Preliminary Injunction

The court starts with Plaintiffs' motion for preliminary injunctive relief. Such relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted). A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The preliminary injunction factors are well established: a plaintiff must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted). In this case, the court's preliminary injunction analysis begins and ends with the element of irreparable harm: Plaintiffs have failed to make that showing.

The D.C. Circuit has set a "high standard" for irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury "must be both certain and

great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The party seeking injunctive relief must show that "the injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted) (cleaned up). The failure to demonstrate irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy*, 454 F.3d at 297 (citation omitted).

Plaintiffs advance multiple grounds to satisfy the requirement of irreparable harm. According to them, absent injunctive relief, they will continue to suffer (1) a deprivation of equal protection under the Constitution, (2) inferior housing conditions in higher-security facilities, (3) lesser access to programming opportunities, and (4) diminished prospects to secure post-conviction relief. None of these claimed injuries meet the high bar for irreparable harm.

### 1.    An Equal Protection Violation is not Per Se Irreparable Harm

Plaintiffs first contend that their "Fifth Amendment equal protection injury constitutes irreparable injury," and "this Circuit has recognized that an equal protection violation like the one suffered by Plaintiffs is a <u>per se</u> irreparable harm." PI Mot. at 36 (citing *Gordon v. Holder,* 721 F.3d 638, 653 (D.C. Cir. 2013)). The argument misconstrues the law.

Courts "do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights." *Hanson v. Dist. of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (citing *Chaplaincy*, 454 F.3d at 302); *see also Ayele v. Dist. of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) (stating that *"*there is no per se rule that the violation of any constitutional right is inherently irreparable"). "Rather, a plaintiff must show why the court will be unable to grant meaningful relief following trial." *Hanson*, 120 F.4th at 244. Thus, a plaintiff must come forward with evidence that they will be "*irreparably* harmed," if required to

wait until entry of final judgment.  *Id.* (emphasis in original).  Such harm must be "sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved."  *Id.* (citation omitted).

Plaintiffs assert that their unequal treatment is "borne out by [ ] evidence demonstrating that BOP residents who are sentenced in D.C. Superior Court face greater stigmatization from staff and other residents."  PI Mot. at 37.  But the only evidence that Plaintiffs offer of such widespread unequal treatment is a five-year-old inspection report of a single BOP facility—FCI McDowell— in which a handful of D.C. Code Offenders reported discriminatory treatment in the form of staff referring to them as "DC Blacks" and telling them that "they cause too much trouble and do not know how to obey orders."  *Id.* (quoting D.C. Corres. Info. Council, *FCI McDowell Inspection Report* 2 (Oct. 17, 2019)[4]).  Such stale, facility-specific evidence fails to establish that Plaintiffs are likely to be similarly treated absent injunctive relief.  Indeed, neither Plaintiff states in his declaration that he has ever been subject to comparable degrading treatment based on his status as a D.C. Code offender.  *See generally* Love Decl.; Butler Decl.  Plaintiffs thus offer no more than speculation that they will face a discriminatory environment absent relief.  It is also pure conjecture that a reduced criminal history score would remediate their concerns about unequal treatment by staff.

2.    *Claimed Improvements in Housing Conditions Do Not Amount to Irreparable Injury*

Next, Plaintiffs maintain that they "suffer irreparable injury because relief could 'alleviate harsh conditions of confinement,' which are harms that 'surely cannot be remediated after the fact.'"  PI Mot. at 37 (quoting *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018)).

---

[4] Available at https://perma.cc/KV5G-2FYL (last visited Jan. 9, 2025).

Specifically, they argue that Program Statement 5100.08's different method of calculating criminal history scores for D.C. Code Offenders "is a significant contributor to Plaintiffs' incarceration in more restrictive facilities." *Id.* According to Plaintiffs, they "are subject to higher rates of violence in higher security facilities, fewer programming opportunities, greater restrictions on liberty, lower pay for work duty jobs, and fewer opportunities to practice their religion." *Id.* (citations omitted). The evidence they present to back up these claims is either weak or non-existent.

To start, Plaintiffs have not established any of the housing-related harm that they fear as to Butler. He entered the BOP at FCI Otisville, a medium-security facility, Butler Decl. ¶ 2, and he remains there today.[5] That is likely in part because he was assessed the criminal history score of two that he expected to receive under the Sentencing Guidelines. Kissell Decl. ¶ 12. Accordingly, Butler's fear that movement to a high-security facility will cause him to miss out on a plumbing vocational course and other programming has not come to pass. Butler Decl. ¶¶ 4–5.

Love's continued custody in a medium-security facility likewise falls short of irreparable injury. Plaintiffs offer statistical evidence that, over the last decade, there have been more than three-and-a-half times more violent incidents at medium-security BOP facilities than low-security facilities. PI Mot., Ex. B., Decl. of Nathan Winshall, ECF No. 2-3, ¶ 7. But Plaintiffs have cited no case for the proposition that an inmate's exposure to a generalized higher risk of violence in a prison setting rises to irreparable harm. Further, Love offers no particularized evidence to support that he personally faces an increased risk of physical harm at his current, medium-security facility. He avers that he faced tangible risks of physical harm at his previous, high-security institution, where he in fact was assaulted, but he does not make similar averments about his current, medium-

---

[5] The BOP's online inmate locator indicates that Love remains in FCI Otisville as of the issuance of this opinion. *See* BOP Inmate Locator, https://www.bop.gov/mobile/find_inmate/byname.jsp (last visited Jan. 15, 2025).

security facility.  Love Decl. ¶ 16.  About his present facility he says no more than that he "see[s] a lot of differences" and nothing specific about an increased risk of violence.  *Id.* ¶ 17.  Such evidence does not establish irreparable harm.  *See Wisconsin Gas*, 758 F.2d at 674 ("The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.").

Love fares no better with his contention that his current placement has "greater restrictions on liberty" than if he were in a lower-security one.  PI Mot. at 37.  Love appears to equate greater opportunities for movement and more open living quarters to a liberty interest.  *See* Love Decl. ¶ 18 (stating at "a low facility I can move around more freely" and that his current placement puts him in "a cell with one bathroom with another man every day"); PI Mot. at 38 (noting that low-security facilities have "dormitory-style housing with more freedom of movement").  But Love cites no case for the proposition that incarcerated persons have a cognizable *liberty* interest in their degree of movement or the openness of their living arrangements.  To the contrary, "a prisoner has no protected interest in his place of incarceration."  *Jolley v. Unknown Named BOP Directors*, 2024 WL 1240091, at *10 (D.D.C. Mar. 22, 2024) (citing cases).  "Nor do prisoners have a right to a particular security classification or program participation."  *Woods v. Hawk-Sawyer*, 2020 WL 6146876, at *3 (D.D.C. Oct. 20, 2020) (citing cases); *see also Meyer v. Reno*, 911 F. Supp. 11, 16 (D.D.C. 1996) (holding that because the plaintiff had "no protected liberty interest in obtaining or maintaining a particular security classification," he "fails to state a cognizable claim with respect to the alleged failure to enroll him in a program that would result in his incarceration at a lower security level").  Enduring more restrictive living conditions in a medium-level facility therefore does not rise to the level of irreparable harm.

Plaintiffs rely on *Aracely, R.* for the proposition that subjecting a detained person to "harsh conditions of confinement" constitutes irreparable harm. PI Mot. at 37. But in that case the plaintiffs were asylum seekers who showed that they were systematically denied parole by federal officials based on an improper, unwritten policy to deter immigration to the United States. 319 F. Supp. 3d at 145–149. As a result, they endured "various physical and psychological impairments that [ ] resulted from or worsened due to their prolonged detention" and "symptoms of increasing mental distress." *Id.* at 155. The irreparable harm in *Aracely, R.* thus derived from an unlawful detention policy that denied asylum seekers the opportunity to secure their freedom, not as here more restrictive housing conditions. In any event, Love has not shown that the present limitations he faces in a medium-security facility are the type of "harsh conditions of confinement" that warrant the court's extraordinary intervention. *Id.*

3. *Fewer Programming Opportunities and Other Claimed Injuries Do Not Amount to Irreparable Injury*

Reduced programming opportunities also does not amount to irreparable harm. PI Mot. at 37–38. The sole case on which Plaintiffs rely is *Tanner v. Federal Bureau of Prisons*, but there the plaintiff established irreparable harm because his imminent transfer would remove him from a specific aquaculture training program not available at the new facility; cause him to lose eligibility for a cable program that he had worked for two years to achieve; and result in a sharp decrease in pay. 433 F. Supp. 2d 117, 124–25 (D.D.C. 2006). Love, by contrast, does no more than vaguely assert that lower-security facilities have "more reentry programs and deeper, therapeutic programs," and that "[c]ollege representatives come to lows and you get to access accredited college programs and can get certifications." Love Decl. ¶ 19. He does not identify any specific program or college offering of interest to him that is unavailable at his present facility. Nor does he explain how the immediate denial of enhanced programming opportunities adversely impacts

him apart from a generalized desire to participate.  So, even if Love is correct that a low-security facility would afford him enhanced programming, he has not shown that the ongoing denial of such opportunities harms him in a manner that is "certain, great, actual, and not theoretical." *Tanner*, 433 F. Supp. 2d at 125 (citation omitted).

Finally, Love offers no proof at all to support his assertion that he receives "lower pay for work duty jobs" or has "fewer opportunities to practice [his] religion" in his present placement. PI Mot. at 37.  His declaration makes no mention of either claimed harm.  *See generally* Love Decl.

### 4.    *Injuries Related to Post-Conviction Relief Are Too Speculative*

Plaintiffs claim one final form of irreparable harm: the BOP's criminal history scoring system for D.C. Code Offenders "affects their ability to receive post-conviction relief."  PI Mot. at 39.  According to Plaintiffs, an inflated criminal history score adversely impacts what is known as a PATTERN score, which is a recidivism risk assessment tool.  *Id.* at 9–10, 39–40.  Plaintiffs say that, because D.C. Superior Court judges heavily rely on PATTERN scores in making compassionate release and similar determinations, the BOP's scoring policy reduces their prospects for post-conviction relief.  *Id.* at 10–11, 39–40.

But even accepting the proffered connection between an inflated criminal history score and a reduced likelihood of post-conviction relief, Love will not feel that effect anytime soon.  He is not eligible for early release under D.C. law until 2035.  Mot. to Dismiss at 41–42.  Preliminary injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (citations omitted).

\*        \*        \*

15

None of what the court has written should be taken to diminish the hardships faced by prisoners while in custody of the BOP.  The question before the court is a narrow one: whether, absent immediate relief, Plaintiffs will suffer irreparable harm if they remain in their present medium-security placements until the court finally resolves this matter.  They have not carried that heavy burden.

### B.    Motion to Dismiss

The court now turns to Defendants' motion to dismiss.  The court begins with various threshold issues before turning to the sufficiency of Plaintiffs' pleading.

### 1.    Standing

Defendants first contend that Plaintiffs lack standing.  Mot. to Dismiss at 15–19.  The court disagrees.

"The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). A plaintiff must show that they meet the "irreducible constitutional minimum" of Article III standing: (1) injury in fact, (2) causation, and (3) redressability.  *Lujan*, 504 U.S. at 560–61.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotation marks and internal citations omitted). To establish standing at the motion to dismiss stage, "a plaintiff is required only to state plausibly that each standing element exists." *Jeffries v. Volume Servs. America, Inc.*, 928 F.3d 1059, 1063 (D.C. Cir. 2019).

Defendants do not dispute that Love has adequately pleaded an injury in fact. *See* Mot. to Dismiss at 15–19.[6] They focus their arguments on the second and third elements. *Id.* at 16–19. They contend that "Plaintiffs cannot demonstrate that there is a causal connection between the Bureau's conduct and the alleged injury," because "Plaintiffs' criminal history score is just one of several factors that are used by the Bureau to calculate [their] security level score[s]." *Id.* at 16–17. There are "too many intervening links in the chain of causation" to trace Plaintiffs' claimed injuries to the unequal scoring policy. *Id.* at 17. For similar reasons, Defendants say the redressability element is not satisfied. They contend that, because the BOP considers factors other than criminal history score in making the discretionary determination about housing placement, a favorable order from the court still would not abate Plaintiffs' claimed injuries because the BOP retains ultimate "discretion to determine the appropriate security facility." *Id.* at 18.

Defendants misunderstand of the nature of the alleged injury. Love's injury is not that he has in fact been denied less restrictive housing and its attendant benefits, but the denial of an equal *opportunity* to secure those advantages. "The 'injury in fact' in an equal protection case . . . is the denial of unequal treatment resulting from imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also CC Distribs. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit*[.]") (emphasis in original); *W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1574 (D.C. Cir. 1984) (agreeing that the plaintiffs' injury was

---

[6] Defendants do dispute that Butler has suffered an injury in fact, because the BOP ultimately calculated the same criminal history score as he expected under the Sentencing Guidelines. Mot. to Dismiss at 16. The court does not reach this argument because it is satisfied that Love has made a plausible case of standing. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("To establish jurisdiction, the court need only find one plaintiff who has standing.") (citing *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009)).

"being denied an opportunity to compete for" a certain benefit); *id.* at 1575 (describing the holding in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), as "the individual plaintiff's injury was the denial of the opportunity to obtain housing for which he would otherwise be qualified").

Nor must Love plead "that he would have obtained the benefit but for the barrier in order to establish standing." *Northeastern Fla. Chapter*, 508 U.S. at 666; *see also CC Distributors*, 883 F.2d at 150 (stating that the plaintiff was not required to "show that [he] was *certain to receive* the benefit that it has been accorded the lost opportunity"). Love does not need to establish that a lower criminal history score is certain to result in better housing conditions. So, the fact that the BOP has the ultimate say in where he resides does not defeat standing on either the elements of causation or redressability.

Defendants attempt to distinguish cases like *CC Distributors* and *West Virginia Association* on the grounds that a court order in those cases "would afford [the plaintiffs] the opportunity to obtain the benefit they seek—whereas a court order here would not compel the [BOP] to make a new security-level determination," given its ultimate discretion, "which is itself the root cause of Plaintiffs' purported injuries." Defs.' Reply in Supp. of Mot. to Dismiss, ECF No. 31 [hereinafter Defs.' Reply], at 5. But that argument mistakes the showing Love must make. He is not required to plead a "[c]ertainty of success." *W. Va. Ass'n*, 734 F.2d at 1575. "The standing requirement would be a high wall indeed if a plaintiff could only sue when the defendant was under an inescapable obligation to act as the plaintiff desired." *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 727 (D.C. Cir. 2015).

To be sure, Love must show "more than the remote possibility . . . that [his] situation might . . . improve were the court to afford relief." *Id.* at 726 (citation omitted). But he easily surmounts

that bar at the pleadings stage. Plaintiffs allege that Love's criminal history score if calculated under the Sentencing Guidelines would result in a lower security score, making him eligible for a lower security-level facility. Compl. ¶¶ 82–96. That is enough at this stage to establish standing.

   2. *Exhaustion*

  Next, Defendants argue that Plaintiffs' claims must be dismissed because they failed to exhaust administrative remedies. Mot. to Dismiss at 19–22. The court agrees as to Butler, but not Love.

  The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under . . . any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is mandatory and "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002); *see Jones v. Bock*, 549 U.S. 199, 211 (2007). A prisoner must comply with and complete an institution's grievance process before filing suit in federal court. *See Jones*, 549 U.S. at 217–19.

  Plaintiffs nevertheless argue that they were not required to exhaust. They say that "administrative remedies were not 'available'" to them and thus exhausting remedies through the proper channels "would have been futile," such that "neither Plaintiff was required to do so." Pls.' Combined Reply in Supp. of PI Mot. and Opp'n to Mot. to Dismiss, ECF No. 29, at 12 [hereinafter Pls.' Reply & Opp'n]. Plaintiffs assert that because "BOP staff who review grievances have no authority to defy Program Statement 5100.08 . . . and unilaterally re-score Plaintiffs based on a different criminal history rule," exhaustion would be futile. *Id.* at 12.

To support their position, Plaintiffs point to the D.C. Circuit's decision in *Kammerling v. Lappin* for the proposition that a "prisoner must exhaust only such administrative remedies as are available, that is, those prison grievance procedures that provide the possibility of some relief for the action complained of." 553 F.3d 669, 675 (D.C. Cir. 2008) (internal quotations and citations omitted). Their reliance on *Kammerling* is misplaced. The plaintiff in *Kammerling* challenged the application of a federal statute requiring the BOP to collect a prisoner's DNA as violative of his civil rights and constitutional freedoms. *Id.* at 673. The D.C. Circuit reversed the trial court's dismissal for failure to exhaust, holding that this was a "rare" case in which "there is no administrative process to exhaust because the BOP lack[ed] authority to provide Kammerling any relief or to take any action whatsoever in response to his complaint." *Id.* at 675. An act of Congress required the BOP to collect the plaintiff's DNA, leaving it "no discretion" on the matter. *Id.*

No similar mandate applies in this case. It is sufficient that the administrative process could have provided Plaintiffs with *some* relief for the action complained of. *Kammerling*, 553 F.3d at 675 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Program Statement 5100.08 affords the agency discretion in making housing determinations. So, even if Plaintiffs were unlikely to have their criminal history scores modified because the administrative process itself would not have likely produced a policy change, Plaintiffs have not shown that the process could not have resulted in *some* advantageous relief, such as a discretionary lower-security housing placement. They therefore were required to exhaust. *See id.* ("Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process.").

Butler, however, failed to do so.  He filed suit without filing a grievance of any kind. Kissell Decl. ¶ 11.  Because he did not exhaust administrative remedies, his claims must be dismissed.  *See Jackson v. Dist. of Columbia*, 254 F.3d 262, 270 (D.C. Cir. 2001).

Love is differently situated.  There is no dispute that Love "pursued his grievances to the final step of appeal and received review on the merits in the course of his appeals."  Pls.' Reply & Opp'n at 13.  Still, Defendants contend that Love failed to exhaust because he did not precisely argue that the BOP should have calculated his criminal history score under the Sentencing Guidelines. Mot. to Dismiss at 22.  Instead, Defendants say, he asserted only that the BOP should have applied the criminal history points assigned to him under the *District of Columbia*'s Sentencing Guidelines.  *Id.*

But that is wrong.  Love's initial grievance filing stated that his "points are incorrect.  I came here with 23 points when it should [have] been 15[,] now 12 . . . I would like my points corrected and my classification to reflect [its] correct custody level."  Love Decl., Exs., at 8 (CM/ECF page numbering).  His counselor clearly understood Love to have challenged his "criminal history scoring," and responded that it was "correct in accordance with PS.5100.18 [*sic*]."  *Id.*  Love then escalated his grievance.  On appeal, he specifically identified that portion of Program Statement 5100.08 applicable to D.C. Code Offenders and wrote:

> To use this to justify scaling all D.C. inmates based on the standard used to scale me is a misinterpretation of the said [statute] and is discrimantory [*sic*], prejudice, and biased towards D.C. inmates. Using it as a standard to differentiate between D.C. inmates and other BOP inmates greatly undermines services offered, programs rendered and safety to the D.C. inmates.

*Id.* at 10.  Thus, without any evident legal training, Love complained that Program Statement 5100.08 treated D.C. offenders unequally to their federal peers, resulting in various disadvantages. This contention easily satisfies the PLRA's exhaustion requirement.  *See Strong v. David*, 297 F.3d

646, 650 (7th Cir. 2002) (stating that "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought"); *accord Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (adopting *Strong* standard); *Aref v. Holder*, 2013 WL 12341048, at *4 (D.D.C. Feb. 19, 2013) (same).

### 3.    *Judicial Review Bar Under 18 U.S.C. § 3625*

Next, Defendants argue that judicial review of Plaintiffs' claims is barred by 18 U.S.C. § 3625.  Mot. to Dismiss at 23–26.  That provision makes the APA inapplicable "to the making of any determination, decision, or order" under Title 18, Part II, Chapter 229, Subchapter C, which includes § 3621, titled "Imprisonment of a convicted person."  Section 3621, in turn, authorizes the BOP to "designate the place of the prisoner's imprisonment" based on a variety of factors, including "the prisoner's security designation" and "the history and characteristics of the prisoner." 18 U.S.C. § 3621(b).  Defendants argue that, because Plaintiffs "plainly seek[] a judicial determination to force the Bureau to re-house Plaintiffs based on a re-calculated score," their claims are foreclosed to judicial review under § 3625.

But courts have construed § 3625 more narrowly than Defendants assert.  Courts have stated that § 3625 bars review of individualized housing determinations, not as here a challenge to a broad policy that informs the designation decision.  *See Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004) ("A placement decision itself is not open to challenge under the APA, *see* 18 U.S.C. § 3625, but [the plaintiff] does not contest his current placement; he contests only the rules that will be used to decide where he should serve the last few months of his time."); *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) (stating that "§ 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions"); *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 84 (D.D.C. 2006) (finding APA claim cognizable under 18 U.S.C. § 3625

where Plaintiff "challenges the rulemaking leading to the BOP policy that informed his confinement determination, rather than challenging the determination itself"). This interpretation is confirmed by the legislative history. A Senate Report explains that "[t]he phrase 'determination, decision, or order' is intended to mean adjudication of specific cases as opposed to promulgating of generally applicable rules." S. Rep. No. 98-225, at 149 (1983). The statute thus "assure[s] that the [BOP] is able to make decisions . . . for *a particular prisoner* without constant second guessing." *Id*. (emphasis added). Section 3625 therefore is no bar to review of the claims at issue in this case.

Defendants further argue that allowing Plaintiffs' suit to proceed "would plainly thwart Congressional intent to insulate the Bureau's housing determinations from judicial review by permitting an end-run around 18 U.S.C. § 3621 and 3625 through a challenge to a component of the Bureau's security-level scoring process to force new housing determinations." Defs.' Reply at 10–11. But a favorable outcome in this case would not compel the BOP to change any particular housing designation—including those of Plaintiffs—or subject such decision to judicial review. *See Richmond*, 387 F.2d at 605 (observing that "victory in this litigation would not entitle [the plaintiff] to any change in the duration or even the location of his confinement"). It simply would require the BOP to score D.C. Code Offenders as it does their federal counterparts, thereby providing opportunities that higher scores do not afford. Nothing in § 3625 prevents such a remedy.

Finally, Defendants contend that APA review is foreclosed because "Congress has committed to the Bureau's [ ] discretion where to house inmates in Bureau custody." Mot. to Dismiss at 25. But, once again, Plaintiffs are not challenging their individual housing placements. They contest the BOP's alleged discriminatory treatment of D.C. Code Offenders in the decision-

making process.  Moreover, Plaintiffs have not asked the court to determine whether the BOP's placement of either of them violates § 3621.  *Id.* at 25–26.  The court therefore has no reason to evaluate whether § 3621 is "drawn in such broad terms that in a given case there is no law to apply."  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021) (citations omitted).

### 4.    *Plaintiffs State a Plausible Claim for Relief*

At last, the court arrives at the sufficiency of Plaintiffs' pleading.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344–45 (D.C. Cir. 2018) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).

Plaintiffs' contention that the BOP's criminal history scoring policy is arbitrary and capricious states a plausible APA claim.  Agency action is "arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'"  *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (*quoting Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)).  Here, Plaintiffs allege that they are similarly situated to federal code offenders sentenced in federal court, yet the BOP treats the two groups differently in how their criminal histories are scored.  Compl. ¶ 36.  As to Love, for instance, they aver that, had the BOP scored him under the Sentencing Guidelines, his criminal history score would be lower.  So, too, would his security point score, and a lesser security point score would make him eligible for a lower-security facility.  That is more than enough to state an arbitrary-and-capricious APA claim.

Defendants' sole response is that D.C. Code Offenders and federal code offenders are not "similarly situated" and therefore treating them differently is not arbitrary and capricious. Mot. to Dismiss at 32–33. In fact, Defendants go so far as to say the "heightened scoring criteria" for D.C. Code Offenders "in part is justified by the Bureau's requirement to consider security concerns in their placement of offenders, and the underlying violence of offense[s] committed by D.C. Code Offenders which is a highly relevant distinction between the two populations." *Id.* The court has no need to assess that explanation at this juncture. It is sufficient for now that the complaint plausibly establishes that D.C. Code Offenders and federal code offenders are similarly situated insofar as the BOP is required to make housing designations for both groups consistent with the statutory factors set forth in § 3621. That code provision draws no facial distinction between the two groups. Whether the BOP's justification for differential treatment passes muster will be resolved on summary judgment.

The court need not assess the plausibility of Plaintiffs' remaining claims. Plaintiffs have represented that they will not seek discovery and are content to litigate the next stage solely on an administrative record. Accordingly, the court will defer ruling on Defendants' arguments as to the remaining claims and address them on cross-motions for summary judgment.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court denies Plaintiffs' Motion for a Preliminary Injunction and grants in part and denies in part Defendants' Motion to Dismiss. Plaintiff Butler's claims are hereby dismissed for failure to exhaust. Defendants' Motion is denied as to Plaintiff Love.

Dated:  January 15, 2025

Amit P. Mehta
United States District Court Judge